## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KAREN JACKSON,
　　　　Plaintiff

　　　　vs

NORTHWEST LOCAL SCHOOL
DISTRICT,
　　　　Defendant

Case No. 1:09-cv-300
Barrett, J.
Hogan, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff Karen Jackson, the mother of KJ, brings this case pro se pursuant to the

Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401, et seq.  Defendant is the

Northwest Local School District (Northwest).  KJ is a child with a disability as defined in the

IDEA.  KJ's mother alleges that Northwest failed to promptly identify KJ as a child with a

disability under the IDEA, failed to comply with the procedural requirements of the IDEA, and

failed to hold a Manifestation Determination Review prior to its expulsion of KJ in November

2007.  Following a due process hearing requested by KJ's mother, the Independent Hearing

Officer (IHO) issued a decision partially favorable to KJ.  KJ's mother appealed to a State Level

Review Officer (SLRO) who affirmed in part and reversed in part the decision of the Independent

Hearing Officer.  Thereafter, KJ's mother filed this action in federal court seeking judicial review

of the state administrative decision.  *See* 20 U.S.C. § 1415(i)(2)(A).

This matter is before the Court on plaintiff's motion for summary judgment (Doc. 21),

defendant's brief on administrative appeal (Doc. 23), and plaintiff's reply brief. (Doc. 26).

### FINDINGS OF FACT

KJ was born in June 1999.  In February 2006, when KJ was six years old and in the first

grade in the Northwest Local School District, KJ was referred to an Intervention Assistance Team due to concerns about KJ's academic progress and behavior raised by her mother. (Exh. B). Dr. David Zucker, a school psychologist, diagnosed KJ with Attention Deficit Disorder. (Exh. E). KJ was considered to be a child "at risk" and specific interventions were adopted and implemented during the spring of KJ's first grade school year. (Tr. 89-90). These interventions included, among others, in-school counseling services to help KJ make and keep friends, manage and control her anger, and perform better at school. (Exh. 13). Barbara Kalbi, the Northwest Special Education Consultant, testified that KJ responded appropriately to the interventions and did not require an Individualized Education Program (IEP) at that time. (Tr. 123). Kalbi testified that many children who have a diagnosis of ADHD do not require an IEP. *Id.* Kimberly Uetrecht, a special education teacher, testified that where interventions are found to be effective in satisfactorily assisting a student's needs, additional or more intensive interventions are not introduced. (Tr. 58). The Intervention Assistance Team reviewed KJ's response to the interventions in 2006 and 2007. (Exhs. B, C). Kalbi testified that at that time, there was no indication that additional or intensive intervention was necessary such that KJ would require an IEP. (Tr. 123-124).

At the start of the 2007-2008 school year, when KJ was beginning the third grade, she continued to receive intervention services. Those interventions included receiving one-on-one instruction in the classroom, being pulled out for small group instruction, and obtaining modifications within the classroom to reduce distractions. (Exhs. 2, 3, 4; Tr. 90). However, by October 2007, KJ was exhibiting additional academic and behavioral problems that concerned the Intervention Assessment Team. These problems included speaking out, laughing and moving

2

around the room at inappropriate times, physical aggression, and appearing to talk to someone who was not present. (Exhs. 5, 13). The Team determined that in addition to continuing the intervention strategies currently in place, KJ should be referred to an outside mental health agency, among other strategies. (Exh. 5). In November 2007, KJ was suspended and ultimately expelled for threatening behavior. (Exh. 7). However, KJ was given the option of returning to school if she received psychological counseling and provided written confirmation that she was not a danger to herself or others. (Exh. 7).

A letter dated November 13, 2007 from KJ's physician, Dr. Richburg-Whitfield, advised that KJ had been diagnosed with Attention Deficit with Hyperactivity Disorder. (Exh. 10). Dr. Richburg-Whitfield stated that KJ had never formally been evaluated by a psychiatrist so the doctor could not comment on whether KJ had any other mental illness. *Id.*

On November 20, 2007, KJ's mother, through counsel, requested that the school conduct a Multi-Factored Evaluation for KJ to determine whether KJ has a disability which falls under the IDEA. Counsel also requested the school to conduct a Manifestation Determination Review[1] in relation to the November 6, 2007 suspension. (Exh. L).

KJ did not receive home instruction from Northwest from November 6, 2007, the suspension date, until December 17, 2007. (Tr. 162). KJ received home instruction from December 20, 2007 through January 11, 2008. (Tr. 44-45). However, the home instruction was interrupted by winter break.

---

[1] When a special education student violates school rules, "the IDEA provides for a specific protocol to be used to evaluate the appropriate next steps. Specifically, a 'manifestation determination' occurs, in which members of the IEP team determine whether the incident was a 'manifestation' of the student's impairment. *See* 20 U.S.C. § 1415(k)(1)(E)." *Y.B. v. Williamson County Bd. of Educ.*, No. 3:08-0999, 2009 WL 4061311, at *1 (M.D. Tenn. Nov. 20, 2009).

KJ returned to school on January 15, 2008, after submitting a psychological report from James Brush, Ph.D.  (Exh. 11).  On January 17, 2008, KJ was referred for a further evaluation to address her academic and behavioral needs. (Exh. 12).

A Multi-Factored Evaluation was then initiated by school officials. (Exh. 13).  The Evaluation Team Report, which was completed on March 3, 2008, concluded that KJ qualified for special education services under the category of "emotional disturbance." (Exh. 13).

An Individualized Education Program was developed for KJ to establish necessary interventions, goals, and long-term and short-term objectives. (Exh. 14).  The IEP addressed both KJ's academic needs and behavioral concerns. (Tr. 90-91).  The IEP was amended in June 2008 to provide KJ more small group instruction in language arts and math. (Exh. 15).  Both the original and amended IEP were approved by KJ's mother. *Id.*[2]

Shortly after the original IEP was signed and implemented, KJ's mother filed a series of due process complaints and requested a due process hearing. (Exh. A).  KJ's mother objected to KJ's  "emotional disturbance" disability classification and sought to change her designation to "other health impaired" based on KJ's ADD diagnosis.  KJ's mother also objected to the delay in evaluating and implementing an IEP for KJ in view of her ADD diagnosis in 2006.  KJ's mother also raised issues concerning the lack of coordinated home instruction during KJ's suspension and the failure of school officials to notify her of her procedural rights by not giving her the booklet "Whose IDEA is this?" until January 2008.

---

[2]According to Northwest, the amended IEP continued in effect through April 3, 2009 and a subsequent IEP was developed and implemented for KJ.

4

A due process hearing[3] was held before an Impartial Hearing Officer at which school officials, Dr. Brush, and KJ's mother testified. School officials testified that the disability designation of "emotional disturbance" or "other health impaired" did not affect the goals and interventions of the IEP for KJ because such goals and interventions are based on the student's needs and not the disability label. Betsy Schulte, an intervention specialist, testified that classifying a student as having an emotional disturbance provided a student with greater assistance and flexibility than a classification of "other health impaired." (Tr. 98-99). The Independent Hearing Officer determined that Northwest's failure to classify KJ's disability as "other health impaired" as opposed to "emotional disturbance" caused no harm to KJ because the services provided to meet KJ's needs would be the same under either classification. The IHO noted, however, that the parties, by agreement, would reconvene KJ's IEP team to consider KJ's mother's request for a re-classification of KJ's disability.

The IHO also determined that Northwest failed to hold a Manifestation Determination Review in November 2007, and that KJ was not given an adequate opportunity to complete school work while she was suspended before returning to the classroom setting. The IHO also found that KJ was advanced from grade to grade not because of academic performance, but rather to keep her with age appropriate peers. The IHO further found the school failed to rebut KJ's mother's assertion that she did not receive the "Whose IDEA" booklet until January 2008 and that such failure contributed to the school's failure to protect a student suspected to have a disability.

---

[3]The IDEA sets forth procedural safeguards allowing parents or the school district to request a due process hearing to contest "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. §§ 1415(b)(6)(A), (f), (k).

The IHO concluded that KJ was entitled to compensatory education of home instruction for a period of nine weeks for at least six hours per week based upon: (1) Northwest's failure to conduct a Manifestation Determination Review when KJ was suspended for more than ten days; (2) Northwest's failure to timely provide KJ's mother with the procedural safeguards booklet; and (3) Northwest's delay in providing home instruction and failure to coordinate between the home instructor and regular classroom teacher.  However, the IHO rejected the claim  that Northwest should have identified KJ as a child with a disability in 2006.

KJ's mother appealed the decision of the IHO to the State Level Review Officer (SLRO). The SLRO reversed the IHO's decision that Northwest was obligated to conduct a Manifestation Determination and to provide instruction to KJ during her suspension/expulsion because KJ was not yet identified as a "child with a disability" at the time of her suspension.  The SLRO also determined that while Northwest did not provide KJ's mother with the procedural safeguard booklet until January 2008, that failure did not result in substantial harm to KJ and was therefore harmless error.  The SLRO rejected KJ's mother's contention that KJ was mis-classified based upon her ADD diagnosis.  The SLRO determined that the classification of KJ's disability as "emotional disturbance" rather than "other health impaired" was supported by the record.

However, the SLRO determined that on October 23, 2007, when the Intervention Team recommended KJ be referred to an outside mental health agency, Northwest had reason to suspect KJ was a child with a disability and failed to conduct a multi-factored evaluation of KJ by the January 24, 2008 deadline.  Northwest completed the multi-factored evaluation five weeks later on March 3, 2008.  The SLRO concluded that Northwest's failure to timely evaluate KJ resulted in a loss of five weeks and one day of services and instruction to which she was entitled under the

6

IDEA and ordered that Northwest provide that amount of compensatory education to KJ as set forth in her IEP.

KJ's mother appealed the decision of the SLRO to this federal court.  Liberally construed, plaintiff's motion for summary judgment raises three grounds for reversal of the SLRO's decision: (1) that the SLRO erred by finding that KJ's mother failed to prove that Northwest unduly delayed identifying KJ as a student with a disability when the record supported a finding of eligibility in May 2006; (2) that the SLRO erred by finding harmless error in Northwest's failure to provide KJ's mother with the procedural safeguards booklet in 2006; and (3) that the SLRO erred by finding Northwest was not required to conduct a Manifestation Determination Review when KJ was suspended from school on November 6, 2007. (Doc. 21).

## THE IDEA AND STANDARD OF REVIEW

"The Individuals with Disabilities Education Act[4] . . . requires States receiving federal funding to make a 'free appropriate public education' (FAPE) available to all children with disabilities residing in the State, § 1412(a)(1)(A)." *Forest Grove School Dist. v. T.A.*, 129 S.Ct. 2484, 2487-88 (2009).  The Act defines a free appropriate public education as special education and related services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

---

[4]The IDEA was enacted in 1970 as the Education of the Handicapped Act and renamed the Individuals with Disabilities Education Act in 1990. *Forest Grove School Dist. v. T.A.*, 129 S.Ct. 2484, 2491 n.6 (2009) (citing § 901(a), Pub. L. 101-476, 104 Stat. 1142).

> (D) are provided in conformity with the individualized education program
> required under section 1414(d) of this title.

20 U.S.C. § 1401(9). The IDEA was enacted to guarantee children with disabilities "a free appropriate public education that emphasizes special education and related services[5] designed to meet their unique needs and prepare them for further education, employment, and independent living." *See* 20 U.S.C. § 1400(d)(1)(A).

In furtherance of this goal, a school system conducts an initial evaluation of a child to determine the presence of a disability and the necessity for special education or related services. 20 U.S.C. §§ 1414(a), (b). The "child find" provisions of the IDEA require school districts to identify, locate, and evaluate children with disabilities in need of special education and related services. *See* 20 U.S.C. § 1412(a)(3)(A). Such children include those "suspected of being a child with a disability under § 300.8 and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1). The IDEA also "requires that knowledgeable personnel evaluate a child suspected of having a disability and determine whether there is a disability as defined by IDEA, and if so, the educational needs of the child." *Renner v. Board of Educ. of Public Schools of City of Ann Arbor*, 185 F.3d 635, 638 n.2 (6th Cir. 1999).

School districts must then establish an Individual Education Plan (IEP) for each child

---

[5]Under the IDEA, "special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including--(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29).

"The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." *Cedar Rapids Community School Dist. v. Garret F. ex rel. Charlene F.*, 526 U.S. 66, 69 (1999). *See also* 20 U.S.C. § 1401(26).

with a disability. *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004).

The IEP must "contain a specific statement of the child's current performance levels, the child's

short-term and long-term goals, the educational and other services to be provided, and criteria for

evaluating the child's progress." *Deal*, 392 F.3d at 853 (quoting *Knable v. Bexley City Sch. Dist.*,

238 F.3d 755, 763 (6th Cir. 2001)). The development of the IEP is a team effort, consisting of

input from teachers, special educators, the child's parents, a representative of the school district,

and other individuals with special expertise. 20 U.S.C. § 1414(d)(1)(B).

Under the IDEA, the federal court: "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its

decision on the preponderance of the evidence, shall grant such relief as the court determines is

appropriate." 20 U.S.C. § 1415(i)(2)(C). In reviewing Northwest's challenged actions, the Court

examines Northwest's compliance with the procedural and substantive requirements of the

IDEA. *Burilovich v. Board of Educ. of Lincoln Consolidated Schools*, 208 F.3d 560, 565 (6th

Cir.), *cert. denied*, 531 U.S. 957 (2000). *See also N.L. ex rel. Mrs. C. v. Knox County Schools*,

315 F.3d 688, 693 (6th Cir. 2003).

A school district's compliance with the procedural requirements of the IDEA are strictly

reviewed. *Deal v. Hamilton County Bd. of Education*, 392 F.3d 840, 854 (6th Cir. 2004).

However, a finding that a school district violated the procedural requirements of the IDEA will

entitle a child or parent to relief only where the violation cause substantive harm. *Knable*, 238

F.3d at 764. To establish a procedural violation of the IDEA, "the claimant 'must show that

school officials overlooked clear signs of disability and were negligent in failing to order testing,

or that there was no rational justification for not deciding to evaluate.'" *Board of Educ. of Fayette*

9

*County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (quoting and adopting standard set forth

in *Clay T. v. Walton County Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997)).

In examining substantive compliance with the IDEA, the Court must apply a "modified de

novo" standard of review to the findings of fact made in the state administrative action. *See*

*Knox County Schools*, 315 F.3d at 692; *Knable*, 238 F.3d at 764. "Under a modified de novo

standard of review, a district court is required to make findings of fact based on a preponderance

of the evidence contained in the complete record, while giving some deference to the fact

findings of the administrative proceedings, particularly when educational expertise is essential to

the findings." *Knox County Schools*, 315 F.3d at 692 (citing *Knable*, 238 F.3d at 764; *Burilovich*,

208 F.3d at 566). The Court is required to make an "independent decision" based on a

preponderance of the evidence while giving "due weight" to the findings of the state

administrative agency. *Board of Educ. v. Rowley*, 458 U.S. 176, 205, 206 (1982). In *Burilovich*,

the Sixth Circuit clarified the "due weight" to be given by the district court to the state agency

findings:

> Because administrative findings in IDEA cases should be afforded less deference
> than that given to agencies under the substantial evidence test, and in view of the
> IDEA's preponderance of the evidence standard, we hold that administrative
> findings in an IDEA case may be set aside only if the evidence before the court is
> more likely than not to preclude the administrative decision from being justified
> based on the agency's presumed educational expertise, a fair estimate of the worth
> of the testimony, or both.

*Burilovich*, 208 F.3d at 567. Where, as here, a party files a motion for summary judgment, "the

court should still apply modified de novo review, but must ensure that there are no genuine issues

regarding the facts essential to the hearing officer's decision. In rendering its decision, the court

may still rely upon the hearing officer's presumed educational expertise, as long as the material

10

facts underlying the officer's determination are not in dispute." *Burilovich*, 208 F.3d at 567 (internal citation omitted).

Where a state has a two-tiered system of review like Ohio, the Court gives due weight to the final decision of the state decision-maker, in this case the State Level Review Officer. *See Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 624 (6th Cir. 1990). *See also Burilovich*, 208 F.3d at 567 ("when there is a conflict between the holdings of the local and state hearing officers, the court must defer to the state hearing officer's decision in reviewing the record on appeal"). The burden of proof rests with KJ's mother, the party who appealed the decision of the State Level Review Officer. *See Schaffer v. West*, 546 U.S. 49, 56-58 (2005).

## ANALYSIS

Plaintiff's primary contention on appeal is that Northwest should have identified KJ as a disabled child in the spring of 2006 when KJ was first diagnosed with ADD and suspected of having a disability. Plaintiff argues that Northwest should have implemented an IEP at that time to provide KJ with special education and related services. To remedy this alleged violation, KJ's mother seeks an additional 100 hours of compensatory education services to make up for the two year delay in providing services. A related issue is whether the SLRO erred by finding that Northwest's failure to provide KJ's mother with the procedural safeguard booklet explaining her rights under the IDEA caused no substantive harm to KJ prior to the actual implementation of her IEP in 2008.

As it relates to this case and KJ's 2006 diagnosis of ADD, the IDEA defines the term "child with a disability" as a child: (i) with . . . other health impairments . . . ; (ii) who, by reason thereof, needs special education and related services. *See* 20 U.S.C. § 1401(3)(A). The term

11

"other health impairment" is defined as "having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that– (i) Is due to chronic or acute health problems such as . . . attention deficit disorder or attention deficit hyperactivity disorder . . ., and (ii) Adversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(9).  Thus, to qualify for benefits as a disabled child under the IDEA, three criteria must be met: (1) the child must suffer from one or more of the categories of impairments delineated in IDEA, (2) the child's impairment must adversely affect his educational performance, and (3) the child's qualified impairment must require special education and related services.

In the instant case, the SLRO determined that KJ's mother failed to meet her burden of proving that in 2006 KJ's ADD was an acute or chronic health problem that limited her strength, vitality or alertness for purposes of the "other health impairment" category of disability, even though a school psychologist diagnosed KJ with Attention Deficit Disorder, combined type. (SLRO Decision at 6).  The SLRO further determined that even if KJ's ADD in 2006 limited KJ's strength, vitality, or alertness, the intervention services provided to KJ following the evaluation were "related services," and not "special education services" which were sufficient to satisfy KJ's needs until November 2007. (SLRO Decision at 6).  The SLRO concluded that since KJ needed only related services and not special education services in 2006, she did not meet the definition of a "child with a disability" under the IDEA based on her ADD. *Id*.

A preponderance of the evidence in the record supports the finding of the SLRO that KJ was not a child with a disability in 2006 because the related services provided to her were sufficient to meet her needs at that time.  In support of her argument, KJ's mother presents a

12

document entitled "St. Aloysius Outpatient Treatment Plan" and diagnostic assessment form specifying a diagnosis of ADHD. (Doc. 15 and Doc. 21, attachment). This report is neither signed nor dated, so the Court is unable to discern who authored the report. Even accepting the content of the report–that KJ was diagnosed with ADHD–the result is the same. Whether KJ's diagnosis was "ADD" or "ADHD," the undisputed evidence of record shows that the interventions put in place to assist KJ were satisfactory in addressing her educational needs in 2006. Those interventions included receiving one-on-one instruction in the classroom, being pulled out for small group instruction, receiving in-school counseling services, and obtaining modifications within the classroom to reduce distractions. Progress reports for KJ showed improvement in the fourth quarter of the 2005-2006 school year after interventions were implemented. (Exh. I). While progress reports for the 2006-2007 school year show KJ was struggling with some of her classes,[6] Barbara Kalbi, a special education consultant with Northwest, testified that KJ successfully responded to the interventions in place and that testing did not show KJ was significantly below grade level or that KJ required "intensive intervention." (Tr. 123-124). KJ tested in a "strategic area," meaning she "needed a little bit of support" which she received. (Tr. 124). This testimony was credited by the IHO and SLRO and is entitled to deference by this Court. *Knable,* 238 F.3d at 764. In addition, Kimberly Uetrecht, a special education teacher, testified that where interventions are found to be effective in satisfactorily assisting a student's needs, additional or more intensive interventions are not introduced. (Tr. 58). The evidence also shows that the Intervention Assistance Team reviewed KJ's response to

---

[6]The progress report for the 2006-2007 school year shows KJ was either meeting or approaching grade level standards for reading; approaching grade level standards for science, art, music, and physical education; and below standards for writing, math, and social studies. (Exh. I).

13

the interventions in 2006 and 2007. (Exhs. B, C, D). The preponderance of the evidence fails to show that Northwest violated the IDEA when it failed to identify KJ as a child with a disability in 2006 and develop an IEP for KJ at that time.[7]

Plaintiff has not met her burden of showing that Northwest overlooked clear signs of disability or were negligent in not evaluating KJ for a disability in 2006 when she was first diagnosed with ADD. *L.M.*, 478 F.3d at 313. Northwest did not ignore KJ's early behavioral and academic problems in 2006 and took appropriate action by implementing special interventions and behavioral strategies to assist KJ. The administrative record shows that interventions for KJ were implemented and school officials were given time to determine the effectiveness of such related services before proceeding to more restrictive or intrusive interventions. These additional services provided a basic floor of educational opportunity through KJ's school year and were sufficient under the IDEA. *See L.M.*, 478 F.3d at 314 (under the IDEA, school district required to provide basic floor of educational opportunity, not services intended to "maximize" a child's potential). The SLRO's finding that the interventions implemented for KJ were effective is an administrative finding involving educational expertise which is entitled to deference by this Court. *Burilovich*, 208 F.3d at 567. Plaintiff has failed to establish that Northwest should have identified KJ as a child with a disability in the spring of 2006 or that Northwest unduly delayed

_____

[7]Plaintiff also presents an initial psychiatric evaluation dated April 16, 2007 from the St. Aloysius Med Somatic Clinic. (Doc. 15, attachment). This report confirms the ADHD diagnosis for which the physician recommended a trial of stimulant medication. The physician also diagnosed an "adjustment disorder with future anxiety and depression," which the doctor described as a mood disorder for which he recommended family counseling to help KJ cope with the divorce of her parents. The report does not make any recommendations relating to KJ's schooling or academic needs and, aside from the ADHD diagnosis, does not indicate that KJ is a child with a disability. Like the 2006 report from St. Aloysius, this evidence does not create a material issue of fact on the issue of whether KJ was a child or suspected to be a child with a disability for the relevant time frame. Other documents submitted by plaintiff are duplicative of those already contained in the administrative record and need not be discussed here.

identifying KJ as a student with a disability at that time.

It is clear that in the fall of 2007, however, circumstances changed. In the beginning of KJ's third grade year, KJ's teachers became increasingly concerned about the impact of KJ's behavioral issues on her academic performance. (Tr. 55; Exhs. 3, 4). Her teachers began gathering data and found that in addition to a lack of attention and focus, KJ exhibited behaviors that were distracting to herself and others in the classroom, including speaking out, making noises, and giggling at inappropriate times. *Id*. Northwest reconvened the Intervention Assistance Team on October 23, 2007 to discuss KJ's progress and plans for further testing. (Exh. 5). The Intervention Team reported that in addition to continuation of current interventions and the addition of other strategies to help KJ with social skills, KJ should be referred "to an outside mental health agency." (Exh. 5).

The SLRO determined that the Intervention Team's recommendation for a mental health referral was sufficient reason for Northwest to suspect that as of October 23, 2007, KJ might be a child with a disability thereby obligating Northwest to conduct a full and individualized evaluation to determine if KJ actually had a disability. (SLRO decision at 7, citing 34 C.F.R. § 300.111(c)). Because Northwest did not comply with the time requirements for completing its evaluation of KJ, the SLRO ordered that KJ be given five weeks and one day of compensatory education. (SLRO Decision at 16). Plaintiff does not dispute this finding. (Doc. 21 at 2). Northwest represents it has provided the compensatory education ordered by the IHO and SLRO which could be provided at school and is prepared to provide the remainder of the compensatory education services when KJ's mother consents to the compensatory services. (Doc. 23 at 8, n.3). Thus, the SLRO's finding that KJ was entitled to compensatory education services based on the

delay in identifying KJ as a child with a disability in October of 2007 is not at issue and should not be disturbed by this Court.

Plaintiff also challenges the SLRO's finding that Northwest's failure to provide KJ's mother with the procedural safeguard booklet explaining her rights under the IDEA caused no substantive harm to KJ prior to the actual implementation of her IEP in 2008. Plaintiff argues that in 2006, she was denied a copy of the procedural safeguards handbook which hindered her knowledge of KJ's rights and her rights as a parent. (Doc. 21 at 2). KJ's mother contends she had little to no input in the involvement early on in KJ's education. *Id.*

To prevail on this claim, plaintiff must show not only a violation with the procedural requirements of the IDEA, but also that the procedural violation caused substantive harm to KJ or her mother. *Knable,* 238 F.3d at 764 (citing *Metro. Bd. of Pub. Educ. v. Guest,* 193 F.3d 457, 464-65 (6th Cir. 1999); *Daugherty v. Hamilton County Schools,* 21 F. Supp.2d 765, 772 (E.D. Tenn. 1998)). Substantive harm occurs where the procedural violation seriously infringes upon the parent's ability to participate in the IEP process, deprives an eligible student of an individualized education program, or results in the loss of educational opportunity. *Knable*, 238 F.3d at 765-66.

The SLRO determined that while KJ's mother was not given a copy of the procedural safeguards booklet until January 2008, this omission by Northwest did not result in substantial harm to KJ and was harmless error. (SLRO Decision at 12). The SLRO reasoned that KJ was not a child "with a disability" in the spring of 2006 and, therefore, the failure to provide her mother with the booklet at that time did not result in substantial harm. This finding should be upheld. If KJ was not a child with a disability under the IDEA, then she was not deprived any substantive

16

right nor did she lose any educational opportunities to which she would be entitled under the
IDEA. The unrebutted testimony of Ms. Kalbi indicated that the related services and intervention
provided to KJ were sufficient to meet her academic and behavioral issues at that time. The
preponderance of the evidence in the record supports the finding of the SLRO on this issue.

 With respect to the October 23, 2007 date, which the SLRO determined to be the date KJ
was a child suspected to have a disability, the SLRO found that KJ's mother failed to show she
was substantially harmed by Northwest's failure to provide her with the procedural safeguards
booklet. The Court agrees.

 As the SLRO found, KJ's mother retained counsel by early November 2007 and exercised
her procedural rights through counsel. Counsel's November 20, 2007 letter to Northwest
requested that the school conduct a Multi-Factored Evaluation for KJ to determine whether KJ
had a disability under the IDEA. Counsel also requested that Northwest conduct a Manifestation
Determination Review in relation to the November 6, 2007 suspension. (Exh. L).

 Plaintiff fails to present evidence showing that the gap between the critical October 23,
2007 date and counsel's November 20, 2007 demand letter seriously infringed upon plaintiff's
ability to participate in the IEP process or resulted in the loss of educational opportunity for KJ,
especially in view of the remedial order by the SLRO requiring five weeks and one day of
compensatory education services for KJ. *Knable*, 238 F.3d at 765-66. In the absence of any
evidence showing the short delay seriously impaired plaintiff's ability to participate in the IEP
process, plaintiff's claim for relief based on Northwest's failure to provide her with the
procedural safeguards booklet on or about October 23, 2007 should be denied.

 The final issue raised by plaintiff's motion is whether Northwest erred by failing to hold a

17

Manifestation Determination Review to determine if KJ's suspension and expulsion were a manifestation of her disability. The IHO determined that Northwest erred by failing to conduct a Manifestation Determination Review after KJ was expelled from school on November 6, 2007. The SLRO reversed, finding that KJ had not yet been determined to be a "child with a disability" as of that date and was not entitled to a Manifestation Determination Review under federal or state regulations. (SLRO Decision at 13).

The IDEA prohibits the punishment of a child with a disability for misbehavior that is a manifestation of the disability. Prior to taking disciplinary action against a child with a disability, the school must conduct a "manifestation determination" during which the student's parents and educators consider the relevant information in the student's file, as well as information provided by teacher observations and the parents, to determine whether the conduct at issue "was caused by, or had a direct and substantial relationship to, the child's disability" or "was the direct result of the local educational agency's failure to implement the IEP." 20 U.S.C. § 1415(k)(1)(E).[8] If the child's behavior is determined to be a manifestation of his or her disability, the child must be restored to his or her regular education program. *See* 20 U.S.C. § 1415(k)(1)(F). If not, then the

---

[8]Section 1415(k)(1)(E) provides in full:

Except as provided in subparagraph (B), within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child' s IEP, any teacher observations, and any relevant information provided by the parents to determine--

> **(I)** if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or

> **(II)** if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

18

school may discipline the child as it would any other non-disabled student. *See* 20 U.S.C. §

1415(k)(5)(D)(i).

The IDEA also provides certain rights to children not yet found to be a child with a

disability under the Act:

> A child who has not been determined to be eligible for special education and
> related services under this subchapter and who has engaged in behavior that
> violates a code of student conduct, may assert any of the protections provided for
> in this subchapter if the local educational agency had knowledge . . . that the child
> was a child with a disability before the behavior that precipitated the disciplinary
> action occurred.

20 U.S.C. § 1415(k)(5)(A). A school is deemed to have knowledge of the child's disability and

need for special education if one of three circumstances exist:

> (i) the parent of the child has expressed concern in writing to supervisory or
> administrative personnel of the appropriate educational agency, or a teacher of the
> child, that the child is in need of special education and related services;
>
> (ii) the parent of the child has requested an evaluation of the child pursuant to
> section 1414(a)(1)(B) of this title; or
>
> (iii) the teacher of the child, or other personnel of the local educational agency,
> has expressed specific concerns about a pattern of behavior demonstrated by the
> child, directly to the director of special education of such agency or to other
> supervisory personnel of the agency.

20 U.S.C. § 1415(k)(5)(B). *See also* 34 C.F.R. § 300.534. If a school wishes to expel a student

for whom the school is deemed to have knowledge of the child's disability, then that student may

invoke the "stay-put" right to maintain his or her current educational placement while the school

determines if the student's misbehavior was a manifestation of the student's learning disability.

*See* 20 U.S.C. § 1415(j). *See also S.W. v. Holbrook Public Schools*, 221 F. Supp.2d 222, 225 -

226 (D. Mass. 2002). The current placement of the student is maintained while the Manifestation

Review Determination is conducted.

At the time Northwest expelled KJ, it was deemed to have knowledge that KJ was a child with a disability under 20 U.S.C. § 1415(k)(5)(B).  On October 23, 2007, when the Northwest Intervention Assistance Team concluded that KJ should be referred "to an outside mental health agency," there was sufficient reason for Northwest to suspect that KJ might be a child with a disability and therefore entitled to an evaluation under the IDEA. (SLRO decision at 7, citing 34 C.F.R. § 300.111(c)).  At this meeting, KJ's teacher, special education teachers, mother, counselor, school psychologist, and Intervention Team co-chair expressed "3 major behaviors of concerns" demonstrated by KJ which required a referral to an outside mental health agency such that Northwest was deemed to have had knowledge of KJ's disability and need for special education under 20 U.S.C. § 1415(k)(5)(B)(iii).  It is undisputed that KJ was determined to be a child with a disability in March 2008. (Exh. 13).  There was also testimony from Dr. Brush that KJ's behavior seemed to be a manifestation of a psychological impairment. (Tr. 22).  But for Northwest's delay in evaluating KJ once it suspected KJ was a child with a disability on October 23, 2007, KJ would have been entitled to a Manifest Determination Review since her expulsion exceeded the ten days time limit set forth in the Act.  Thus, Northwest's failure to conduct a Manifestation Determination Review violated the procedural safeguards of the IDEA.[9]

In addition, the Court finds that Northwest's failure to hold a Manifestation Determination Review and maintain KJ's placement in the regular classroom during the pendency of this proceeding violated that the "stay-put" provision set forth in 20 U.S.C. §

_____

[9]The Court notes that the SLRO determined that KJ was not entitled to a Manifestation Determination Review because she had not yet been identified as a "child with a disability," relying on *Brendan K. ex rel. Lisa K. v. Easton Area School Dist.*, No. 05-4179, 2007 WL 1160377, at *14 (E.D. Pa. April 16, 2007).  Neither the SLRO nor the Court in *Brendan K.* addressed the provision of the IDEA governing protections for children not yet eligible for special education services set forth in 20 U.S.C. § 1415(k)(5).  Therefore, the Court finds *Brendan K.* distinguishable from and inapplicable to the instant case.

1415(j). This violation resulted in no school or home instruction to KJ from November 6, 2007, the suspension date, until December 17, 2007. (Tr. 162). This lack of instruction resulted in the loss of educational opportunity for KJ and constitutes substantive harm. Therefore, plaintiff's claim that KJ was improperly denied a Manifestation Determination Review should be sustained.

Upon the finding of an IDEA violation, the Court is authorized to "grant such relief as the court determines is appropriate." *See* 20 U.S.C. § 1415(i)(2)(C)(iii). *See also Deal*, 392 F.3d at 866 (courts have "broad discretion" in fashioning relief under IDEA). Section 1415(k)(1)(F) of the IDEA provides that if it is determined that the child's conduct was a manifestation of a disability, "the IEP team shall ... (i) conduct a functional behavioral assessment and implement a behavioral intervention plan ... [and] (iii) except as provided in subparagraph (G), return the child to the placement from which the child was removed." 20 U.S.C.A. § 1415(k)(1)(F). KJ's removal from the regular classroom at the time of her suspension and expulsion occurred in 2007. The remedy of returning her to the placement from which she was removed, *i.e.*, her classroom, cannot practically be accomplished three years after the fact. In addition, KJ was entitled to remain in the regular classroom setting under the "stay put" provision of the IDEA pending the resolution of the Manifestation Determination Review. To remedy this violation, the Court recommends that KJ be provided compensatory education for the period of time of KJ's suspension and expulsion and that the suspension and expulsion be expunged from KJ's school record.

## IT IS THEREFORE RECOMMENDED THAT:

     1. Judgment be granted on the administrative record for defendant Northwest on plaintiff's claims that Northwest failed to promptly identify KJ as a child with a disability under the IDEA and failed to comply with the procedural requirements of the IDEA. Plaintiff's motion for summary judgment on these claims should be denied.

2. Plaintiff's motion for summary judgment on her claim that Northwest failed to hold a Manifestation Determination Review prior to its expulsion of KJ in November 2007 be granted; that KJ be provided compensatory education for the period of time of KJ's suspension and expulsion; and that the suspension and expulsion be expunged from KJ's school record.

Date: 8/3/10

Timothy S. Hogan
United States Magistrate Judge

22

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KAREN JACKSON,
    Plaintiff

Case No. 1:09-cv-300
Barrett, J.
Hogan, M.J.

vs

NORTHWEST LOCAL SCHOOL
DISTRICT,
    Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

23

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Karen Jackson
10076 Fairglen Drive
Cinti, OH 45251

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  ☑ Agent  ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7002 3150 0000 8389 8602

PS Form 3811, August 2001       Domestic Return Receipt       102595-02-M-1540

1:09cv300   (Doc. 27)